UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>HARPREET SAINI and JOHN LESTER MANDAC NATIVIDAD,<br><br>Defendants. | Civil Action No. _____<br><br>JURY TRIAL DEMANDED |

COMPLAINT

Plaintiff Securities and Exchange Commission (the "SEC"), 444 S. Flower Street, Suite 900, Los Angeles, California 90071, files this Complaint against Defendants Harpreet Saini ("Saini") and John Lester Mandac Natividad ("Natividad"), and alleges as follows:

SUMMARY OF THE ACTION

1. This action involves insider trading by Saini and Natividad, two former information technology employees of Intrado Corporation ("Intrado"), a newswire service provider. Saini and Natividad were required as a condition of their employment to maintain the confidentiality of information belonging to Intrado and its clients, and were expressly prohibited from engaging in insider trading. However, between May 2018 and July 2021, Saini and Natividad breached their duty to Intrado by misappropriating material nonpublic information from it to trade in advance of 1,264 and 395 market-moving announcements issued by Intrado on behalf of 554 and 262 publicly traded companies, reaping net trading profits of at least $864,773 and $657,352, respectively. Approximately 99% of Saini's and Natividad's transactions were executed on U.S. exchanges.

2. Both Saini and Natividad used their authorized access to Intrado's internal press release distribution system to view headlines of forthcoming announcements, along with the expected dissemination date and time. They communicated with one another via private text messages discussing Intrado's clients and press release headlines, their wins and losses, and planned the best ways to profit off of the misappropriated confidential information.

3. From June 2019 to July 2021, Natividad also used an account in his mother's name to trade in advance of more than 74 market-moving announcements issued by Intrado on behalf of at least 67 publicly traded companies, with a win rate of approximately 70%, reaping net trading profits of at least $74,981.

4. By engaging in the conduct described in this Complaint, Saini and Natividad violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

5. The SEC brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], to enjoin such acts, transactions, practices, and courses of business, and to obtain disgorgement, civil monetary penalties, and such other and further relief as the Court may deem just and appropriate.

6. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

7. Venue is proper in the District of New Jersey pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]

because certain acts, practices, transactions, and courses of business constituting violations of the federal securities laws occurred within the District of New Jersey. Specifically, securities transactions that were the subject matter of the fraud were executed on NASDAQ servers located in New Jersey.

## DEFENDANTS

8. Harpreet Saini, age 37, is a citizen of India and resides in Brampton, Ontario, Canada. Beginning in 2015, Saini was employed by Intrado and its predecessor entities in information technology as a senior software developer specialist in its Toronto, Canada, office. His employment was terminated in 2022 as result of the facts alleged in this Complaint.

9. John Lester Mandac Natividad, age 38, is a citizen of Canada and resides in Brampton, Ontario, Canada. Beginning in 2016, Natividad was employed by Intrado and its predecessor entities in information technology as a software developer specialist in its Toronto, Canada, office. His employment was terminated in 2021 as a result of the facts alleged in this Complaint.

## RELEVANT ENTITIES

10. Intrado Corporation, a Delaware corporation headquartered in Omaha, Nebraska, is a global communication services provider. Since 2017, Intrado and its predecessors have been controlled by affiliates of certain funds managed by Apollo Global Management LLC. Intrado is the parent of Intrado Digital Media, LLC ("Intrado Digital Media").

11. GlobeNewswire, Inc., a California corporation, with its principal place of business in New York, New York ("GlobeNewswire"). Founded in 1998, it operates one of the world's largest newswire distribution networks specializing in the delivery of corporate press releases, financial disclosures, and multimedia content to the media, investment community, individual

investors and the general public.  After a series of acquisitions, GlobeNewswire and its predecessors were merged with another company that later changed its name to Intrado. GlobeNewswire is a division of Intrado Digital Media.  GlobeNewswire press releases reach 92 countries in 35 local languages and are distributed to various media outlets in North America and around the world including news agencies and bureaus, daily newspapers, business journals, independent journalists, and TV and radio stations.

## FACTS

**A.     Defendants Owed a Duty of Confidentiality**

12.     Saini and Natividad were required as a condition of their employment to maintain the confidentiality of information belonging to Intrado and its clients.  Both were required to acknowledge in a number of documents that they were expressly prohibited from engaging in insider trading.  For example, per Intrado's employee handbook, Saini and Natividad expressly agreed to "preserve the confidentiality" of such information; that they "owe[d] the Company an implied duty of good faith and loyalty;" and that they "must not purchase, sell or otherwise trade securities of a company with the knowledge of inside information."

13.     Saini and Natividad each signed Intrado documents acknowledging they read and understood the company's confidential information and insider trading policies.  These documents required Saini and Natividad to agree that trading securities while in possession of such information before that information was made public was "against the law," may expose them to "criminal prosecution or civil lawsuits," and that they were prohibited from tipping, including "communicating inside information to any person."  Saini and Natividad acknowledged that "using any non-public information or any client confidential or Intrado

confidential information to trade equities or other securities is strictly against Intrado policy and likely both a crime and a civil offense."

14. Intrado's policies restricted employees' use of personal electronic devices, including mobile phones, which could not be used for business purposes. Saini and Natividad completed all confidentiality and insider trading compliance trainings required by Intrado, which reinforced their duties to not trade on securities while in possession of confidential information.

**B.    Defendants Had Access to Material Nonpublic Information**

15. As software engineers employed by Intrado, Saini and Natividad had authorized access to GlobeNewswire's press release platform, called the "press release desk" ("PR Desk"), which Intrado used to receive draft press releases from clients and disseminate them to the public via GlobeNewswire.

16. Saini and Natividad were able to view draft press releases in the in-progress queue prior to public dissemination of announcements, which they were able to do without detection. This access allowed them to view specific and detailed information about each draft release, including the internal job identification number, the issuer's name, the press release headline, the time when the first draft of the release was submitted by the issuer, and, once set, the scheduled time for publication of the announcement to the public, and whether the release was publicly disseminated or "published."

**C.    Defendants Exchanged Material Non-Public Information Prior to Announcements**

17. Saini and Natividad exchanged information on forthcoming announcements via hundreds of WhatsApp text messages on their personal cell phones. In these messages, Saini and Natividad discussed at least 215 different publicly traded companies that were clients of Intrado at the time.

18. Saini's and Natividad's messages reveal that they actively used confidential information in the PR Desk to profitably trade the issuer's securities prior to the public announcement of unexpected, market-moving news. For example, their text messages show they sought to exploit information involving emerging major news stories, including the coronavirus pandemic, and they discussed their interpretation of headlines of forthcoming announcements and how to profitably trade on the market's reaction to the news, for instance, by shorting stocks in advance of negative announcements by biotechnology issuers.

19. In their text messages, Saini and Natividad shared the substance of headlines, quoting to each other the exact language of forthcoming announcements. They acknowledged making money on trades executed based on the material, nonpublic information they obtained.

20. As one example, on September 30, 2020, Natividad told Saini to "Check out ENLV" in advance of Envilex Therapeutics, Ltd. (NASDQA: ENLV) publicly issuing a press release on October 1, 2020 through GlobeNewswire announcing positive trial results in COVID-19 patients in severe/critical conditions. Saini responded "Buy" and Natividad responded "Ok thanks . . . I just put everything on ENLV." Then, following the release of the October 1, 2020 press release, Natividad texted Saini "Wow ENLV." Saini responded "Dis [sic] u sell everything? Or keeping some?" Natividad responded "I'm good already . . . I sold at 12.50." Saini then responded "Awesome. 100% profit. I am holding some."

21. Both Saini and Natividad encouraged each other to "celebrate" their trading profits.

22. In one example, on June 27, 2018, after Galectin Therapeutics, Inc. (NASDAQ: GALT) issued a press release by GlobeNewswire announcing the issuance of a drug patent, Natividad texted Saini "Good call man made lot of money in GALT" and bragged "F--- I made

6

4,000 dollars. Hahaha. Crazy." Saini responded "Ohhh man. Me 3200…. Gonna get a [sic] expensive lobster now." "Natividad responded "Hahaha 3,000 dollars [sic] lobster. Tell that to the waitress."

23. They also noted that their continued scheme would enable them to retire early. For example, Saini told Natividad he made trading profits "almost as much money as my monthly salary" in one day. Natividad also texted Saini a screenshot of a piece of paper affixed to his wall showing his "motivation each day:" reaping $1,000 per day would produce profits of $250,000 per year. Saini replied "Awesome man," gave it a thumbs up, and said "I like it." Forty minutes later he gave Natividad a ticker symbol of an Intrado client with a forthcoming announcement.

24. Their text messages show that when either Saini or Natividad was unavailable to view the PR Desk because he was out of the office, the other would obtain and share the information so that both could profit from it.

25. For example, on May 24, 2021, one day before Apellis Pharmaceuticals, Inc. (NASDAQ: APLS) issued a press release by GlobeNewswire announcing positive top-line results from the Phase 3 study of its drug, Natividad texted Saini "Yo APLS." Saini responded "Not logged in today. Do you recommend buy or short?" Natividad then recommended that Saini buy APLS stock due to the forthcoming announcement of the company's "Positive top line result of phase 3."

26. Saini and Natividad also lamented missing trading opportunities, including when there was no information accessible in the PR Desk queue or when only partial information was available or had changed while in the in-progress queue, or if trading had been halted before they could trade.

27. As one example, after Reata Pharmaceuticals, Inc. (NASDAQ: RETA) issued a press release by GlobeNewswire on July 23, 2018 announcing positive phase 2 data, Natividad texted Saini saying "Holy f---. Is there a [sic] news?" Saini responded "Yeah. They had positive phase 2 data." Natividad responded "Did we miss it?" to which Saini responded "Yes." Natividad then lamented "Ooh cr—I saw this last Friday. I just could not see if it is good news from header."

28. Saini and Natividad acknowledged in the text messages that they needed to be careful texting the information they saw in the PR Desk in order to keep their scheme secret, indicating that their use of private messages was designed to evade detection of their conduct.

29. In one example, on July 23, 2018, Natividad texted Saini informing him of a draft press release by GlobeNewswire for Merit Medical Systems, Inc.'s (NASDAQ: MMSI) upcoming public offering and asking Saini whether he should take a short position. Saini responded "Don't write news here. Yes short it."

**D.    Defendants Traded in the Securities of Intrado Clients and Reaped Profits**

30. While in possession of the material non-public information obtained from the forthcoming announcements, Saini and Natividad traded in advance of 1,264 and 395 market-moving announcements issued by Intrado, respectively, which were issued by 554 and 262 issuers.

31. Out of all these trades, Saini profitably traded in advance of 910 market-moving announcements issued by 461 issuers, and Natividad profitably traded in advance of 301 such announcements by 215 issuers, resulting in a win rate of approximately 72% and 76%, respectively. Saini and Natividad reaped net trading profits of at least $864,773 and $657,352, respectively. By contrast, Saini's and Natividad's win rate when trading in advance of 58 and 52

announcements not issued by Intrado was approximately 52% and 60%, respectively. Their timely and profitable trading primarily occurred on U.S. exchanges including the NASDAQ and New York Stock Exchange, with approximately 99% of their transactions being executed on U.S. exchanges.

32. Saini and Natividad routinely purchased securities immediately before press releases were publicly disseminated by Intrado, and then closed their positions after the market reacted to the news, often trading before and after regular market hours. They typically traded small amounts of securities, indicating that their trading pattern was designed to evade detection.

33. Examples of Saini's and Natividad's most profitable timely trades while in possession of confidential Intrado information are set forth in the below table:

| Trader | Issuer/Date and Time Intrado Received Draft Press Release | Securities Purchased Date/Time | Press Release Date/Time | Securities Sold Date/Time | Profits |
|---|---|---|---|---|---|
| Natividad | Tesla, Inc. (NASDAQ: TSLA) at 10/23/2019 at 2:36 pm ET | 10,000 TSLA 10/25/19 call options at 10/23/2019 at 3:48 pm ET | 10/23/2019 at 4:54 pm ET | 10,000 call options at 10/24/2019 at 9:30 am ET | $260,200 |
| Natividad | Autozone, Inc. (NYSE: AZO) at 12/09/2019 at 9:51 am ET | 5,500 AZO 12/20/19 call options at 12/9/2019 at 12:47 pm ET<br><br>2,100 AZO 12/13/19 call options at 12/9/2019 at 3:53 pm ET | 12/10/2019 7:55 am ET | 2,100 call options at 12/10/2019 at 9:36 am ET<br><br>5,500 call options at 12/10/2019 at 9:52 am ET | $61,675 |
| Saini | Enlivex Therapeutics Ltd. (NASDAQ: | 6,000 shares at 9/30/2020 at 3:50 pm ET | 10/1/2020 at 6:00am ET | 6,000 shares at 10/1/2020 at 8:01 am ET | $33,285 |

9

| Trader | Issuer/Date and Time Intrado Received Draft Press Release | Securities Purchased Date/Time | Press Release Date/Time | Securities Sold Date/ Time | Profits |
|---|---|---|---|---|---|
|  | ENLV) at 09/30/2020 at 2:21 pm ET |  |  |  |  |
| Saini | Entera Bio Ltd. (NASDAQ: ENTX) at 3/10/2021 at 2:56 pm ET | 15,000 shares at 3/10/2021 at 3:48 pm ET | 3/11/2021 at 8:30am ET | 15,000 shares at 3/11/2021 at 8:33 am ET | $32,945 |

34. Saini and Natividad traded in parallel in advance of 173 market-moving announcements, 144 of them profitably, and reaped net trading profits of $213,371 and $310,750, respectively. Saini and Natividad's win rate when they traded in parallel was approximately 83%. An example of their most profitable timely trading in parallel is set forth in the below table.

| Trader | Issuer/Date and Time Intrado Received Draft Press Release | Securities Purchased Date/Time | Press Release Date/Time | Securities Sold Date/ Time | Profits |
|---|---|---|---|---|---|
| Natividad | ChemoCentryx, Inc. (NASDAQ: CCXI) at 11/25/2019 at 1:40 pm ET | 2,000 CCXI 12/20/19 call options at 11/25/2019 at 2:52 pm ET<br><br>1,600 shares at 11/25/2019 at 3:25 pm ET | 11/25/2019 at 4:05 pm ET | 1,600 shares at 11/25/2019 at 4:36 pm ET<br><br>2,000 call options at 11/26/2019 at 9:30 am ET | $65,421 |
| Saini | Same | 3,000 shares at 11/25/2019 at 2:12 pm ET | Same | 3,000 shares at 11/25/2019 at 4:44 pm ET | $59,709 |

10

**E.      Natividad's Used His Mother's Account as Part of the Fraudulent Scheme**

35. Natividad traded in the account of his mother while in possession of material, nonpublic information he misappropriated from Intrado. Specifically, Natividad sent text messages to his family indicating he was trading in his mother's "margin account" and was "shorting" stocks.

36. From June 2019 to July 2021, Natividad's mother's account traded in advance of 67 market-moving announcements issued by Intrado on behalf of at least 60 publicly traded companies, reaping net trading profits of at least $51,055. During that period, 14 unique IP addresses that were used to log into Natividad's accounts also logged into his mother's accounts.

37. Natividad's mother's account traded in 24 issuers that had been mentioned in Natividad's text messages with Saini and her account traded securities in parallel with Natividad's accounts and Saini's account in advance of at least 21 and 38 announcements issued by Intrado, respectively, with a win rate of approximately 71% and 82%, respectively. For example, on the same date that Intrado received a draft press release from Entera Bio Ltd. as set forth above, Natividad and Saini discussed its ticker symbol and Natividad's mother's account purchased 3,000 shares of Entera Bio. The next day Entera Bio issued an announcement, and immediately after its release, his mother's account sold the entire position reaping profits of about $1,294. After the announcement, Natividad sent Saini a text message stating, "entx keeps going up. I sold it too early." Natividad did not buy or sell Entera Bio shares in his own accounts but instead used his mother's account, as two of the IP addresses that were used to access his mother's account when the Entera Bio shares were purchased and sold had previously been used to access Natividad's accounts hundreds of time.

## CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

38. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 37, above, as if the same were fully set forth herein.

39. Both Natividad and Saini learned material nonpublic information through their employment at Intrado. Both Natividad and Saini knew or were reckless in not knowing, that the information on the PR Desk, which Intrado used to receive draft press releases from clients to disseminate to the public via GlobeNewswire, was material and nonpublic.

40. During the relevant time period, both Natividad and Saini had a relationship of trust and confidence with Intrado that required them to keep nonpublic information confidential. Because Saini and Natividad each signed Intrado documents agreeing to preserve the confidentiality of nonpublic information, Natividad and Saini knew, consciously avoided knowing, or were reckless in not knowing, that they owed Intrado a duty of trust or confidence to keep material nonpublic information confidential. In addition, both Natividad and Saini took steps to conceal their scheme by acknowledging in their text messages that their use of private messages was designed to evade detection of their conduct and by trading in small amounts to avoid detection.

41. Natividad and Saini breached that duty by using their authorized access to Intrado's PR Desk to view headlines of forthcoming announcements, which was material, non-public information and then trading on the basis of that information to make profits of at least $657,352 and $864,773, respectively.

42. In addition, Natividad and Saini exchanged information on forthcoming announcements via hundreds of WhatsApp text messages on their personal cell phones. In doing

so, they tipped one another material non-public information, which they then traded on to make illegal profits. In some instances, Natividad misappropriated material non-public information from the PR Desk and then shared it with Saini. At other times, Saini misappropriated material non-public information from the PR Desk and then shared it with Natividad.

43. In these instances, the tipper who had accessed material non-public information from the PR Desk (whether Natividad or Saini): (i) owed a duty of trust and confidence to Intrado; (ii) breached that duty by tipping the material non-public information to the tippee (whether Saini or Natividad) knowing that the tippee would then trade on the basis of the information; and (iii) obtained a personal benefit through the continuation of Natividad's and Saini's joint insider trading scheme.

44. Conversely, the tippee who had been tipped material non-public information from the PR Desk (whether Natividad or Saini) by the tipper (whether Saini or Natividad): (i) received that information in breach of the tipper's duty of trust and confidence to Intrado; (ii) knew, consciously avoided knowing, was reckless in not knowing, or should have known that the information had been disclosed in breach of the tipper's duty of trust and confidence for a personal benefit through the continuation of Natividad's and Saini's joint insider trading scheme; and (iii) traded on the basis of the material non-public information despite knowing, consciously avoiding knowing, or being reckless in not knowing, that it was material and nonpublic.

45. By engaging in the conduct described above, Natividad and Saini, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made,

in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

46. By reason of the foregoing, Natividad and Saini, directly and indirectly, violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

### I.

Finding that Natividad and Saini violated the provisions of the federal securities laws as alleged herein;

### II.

Permanently restraining and enjoining Natividad and Saini from, directly or indirectly, violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder].

### III.

Ordering Natividad and Saini to disgorge all ill-gotten gains or unjust enrichment with prejudgment interest, pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. § 78ju(d)(5) and 78u(d)(7)];

### IV.

Ordering Natividad and Saini to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u–1(a)];

### V.

Granting such other and further relief as this Court may determine to be just and

necessary.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Dated:  September 30, 2022

*s/ Stephen T. Kam*
Stephen T. Kam
David S. Brown
Attorneys for Plaintiff
Securities and Exchange Commission

## LOCAL RULE 11.2 CERTIFICATION

Pursuant to Local Rule 11.2, I certify that the matter in controversy alleged against the Defendants in the foregoing Complaint is not the subject of any other civil action pending in any court, or of any pending arbitration or administrative proceeding.

<u>*s/ Stephen T. Kam*</u><br>
Stephen T. Kam

## DESIGNATION OF AGENT FOR SERVICE

Pursuant to Local Civil Rule 101.1(f), the undersigned hereby designates the United States Attorney's Office for the District of New Jersey to receive service of all notices or papers in this action at the following address:

> David E. Dauenheimer
> United States Attorney's Office
> Deputy Chief, Government Fraud Unit
> District of New Jersey
> 970 Broad Street, Suite 700
> Newark, NJ 07102

<u>s/ Stephen T. Kam</u><br>
Stephen T. Kam