Joseph Gallo
Martin J. Auerbach
**WITHERS BERGMAN LLP**
430 Park Avenue, 10th Floor
New York, New York 10022
Phone: (212) 848-9856
Fax: (212) 848-9888
Joseph.Gallo@withersworldwide.com
Martin.Auerbach@withersworldwide.com

*Attorneys for Defendant*
*John Lester Mandac Natividad*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>               Plaintiff,<br><br>   v.<br><br>HARPREET SAINI and JOHN LESTER MANDAC NATIVIDAD,<br><br>               Defendants. | Civil Action No.: 2:22-cv-05788-KM-AME<br><br>*Document Filed Electronically* |

### MEMORANDUM OF LAW IN SUPPORT OF
### DEFENDANT JOHN LESTER MANDAC NATIVIDAD'S
### CROSS-MOTION TO STAY

## Table of Contents

**Page**

Table of Authorities ................................................................................................ ii

**FACTUAL AND PROCEDURAL BACKGROUND** ....................................................3

**ARGUMENT** .................................................................................................8

I.    **THE DETERMINATION OF MONETARY RELIEF UNDER**
      **THE CONSENT JUDGMENT SHOULD BE STAYED**
      **PENDING RESOLUTION OF THE OSC CASE** .....................8

      A.    **The Consent Order Calls on the Court to Make a Factual**
            **Determination as to Which There is a Genuine Basis for Dispute** .................. 9

      B.    **The Court Can Obtain Relevant Information from Mr. Natividad**
            **Without Forcing Him to Abandon His Right against Self-**
            **Incrimination** ....................................................................... 10

      C.    **The Standard set forth in *Walsh* Strongly Supports Granting the**
            **Motion to Stay** ..................................................................... 10

      **CONCLUSION** ...................................................................................16

## Table of Authorities

**Page(s)**

**Cases**

*Carlton v. Atlantic County Justice Facility*,
2022 WL 16922151 (D.N.J. 11/14/22) ................................................................11, 12, 14, 15

*Landis v. North Am. Co.*,
299 U.S. 248 (1936).................................................................................................................10

*Licona v Tunnel Barrel & Drum Co., Inc.*,
2023 WL 2644373 (D.N.J. 3/27/23) .....................................................................11, 12, 14, 15

*LM Ins. Corp. v. FAV Transp., L.L.C.*,
No. 14-5424, 2015 WL 4915677 (D.N.J. Aug. 18, 2015) ......................................................14

*Trs. of Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*,
886 F. Supp. 1134 (S.D.N.Y. 1995).......................................................................................11

*United States v. Kordel*,
397 U.S. 1 (1970).....................................................................................................................10

*Walsh Sec. Inc. v. Cristo Prop. Mgmt., Ltd.*,
7 F. Supp. 2d 523 (D.N.J. 1988) ..................................................................................... *passim*

**Statutes**

Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)].........................................................4, 14

Securities Act Section 20(d) [15 U.S.C. § 77t(d)] ..................................................................4, 14

Securities exchange Act of 1934 Section 10(b) [15 USC § 78j(b)].............................................4

**Other Authorities**

Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] .....................................................................4

United States Constitution, Amendment 5...............................................................................2, 14

Canadian Charter of Rights and Freedoms, § 7, Part I of the Constitution Act,
1982, being Schedule B to the Canada Act 1982 (UK), 1982, c 11, (QL) ..........................2, 14

UN General Assembly, International Covenant on Civil and Political Rights, 16
December 1966, United Nations, Treaty Series, vol. 999, p. 171, Article 14(3).................2, 14

Defendant John Lester Mandac Natividad ("Natividad") respectfully submits this Memorandum of Law in support of his cross-motion to stay the motion filed by the United States Securities and Exchange Commission ("SEC") seeking an order of monetary relief against him. Mr. Natividad, a citizen and resident of Canada, seeks that stay pending conclusion of a parallel criminal case currently pending against him in Ontario, Canada. Were that criminal case – predicated on factual allegations virtually identical to those asserted by the SEC in this cation – being brought by the United States Attorney's Office for the District of New Jersey ("USAO"), it is hard to imagine that the USAO would not be seeking to stay this proceeding and the factual inquiry the SEC's motion entails. And if history is any guide, it is virtually certain that such a motion by the USAO seeking such a stay would be granted.

While the government has not sought a stay here, courts in this District have recognized repeatedly that a defendant may be entitled to a stay of civil proceedings when faced with parallel criminal proceedings. Applying the six-factor test set forth in *Walsh Sec. Inc. v. Cristo Prop. Mgmt., Ltd.*, 7 F. Supp. 2d 523 (D.N.J. 1988) ("*Walsh*"), and recently reiterated in two cases in this District decided since this action was filed, we respectfully submit that a stay of the SEC's motion is necessary and proper.

The factual allegations in this SEC civil enforcement action against Mr. Natividad and Harpeet Saini (collectively the "Defendants") are virtually identical to those in an active criminal case that has been brought by the Ontario Securities against the Defendants. That case, captioned *Ontario Securities Commission v. John Lester Natividad and Harpreet Saini*, (the "OSC Case") pending in the Superior Court of Justice – Ontario, seeks to punish the Defendants criminally for the same alleged insider trading at issue in this case.

Rather than default, as Defendant Saini has done, Mr. Natividad, without admitting or denying the allegations in the SEC's complaint in this action, consented to the entry of a judgment establishing liability. However, while the judgment to which Mr. Natividad consented established liability, it expressly reserved for later determination the quantum of monetary relief, if any, the SEC might obtain from him.

By its very nature, determination of that quantum requires a factual inquiry as to which trades alleged by the SEC constituted insider trading based on material nonpublic information. The answer to that factual inquiry is not self-evident. A calculation by the OSC's expert places the value of Mr. Natividad's allegedly wrongful trading at a value less than half the value calculated by the SEC's expert. Critically, Mr. Natividad cannot participate in that factual inquiry at this time – while he faces criminal proceedings in Canada – without waiving his Fifth Amendment rights, and his parallel rights under Section 7 of the Canadian Charter of Rights and Freedoms and Article 14(3) of the International Covenant on Civil and Political Rights, to which the United States and Canada are both signatories.

Were the criminal case pending against Mr. Natividad here, and a stay were sought and obtained by the government, Mr. Natividad would not be faced with that dilemma. However, simply because the criminal case is pending in Ontario rather than here, and the U.S. government has therefore made no application for a stay, he faces that choice.

Proceeding now, rather than granting a stay pending resolution of the OSC case, would confront Mr. Natividad with the Hobson's Choice of either waiving his rights and potentially incriminating himself or asserting his rights and creating an adverse inference that would make the factual inquiry's outcome a foregone conclusion. While presumably unintended, that would give an untoward advantage to the SEC – the adverse inference from invocation of protected

rights – much like the untoward advantage to defendants that stays sought by the government are intended to prevent. Fortunately, courts have recognized and exercised their inherent power to grant stays and to eliminate that unfair conundrum.  Notably, while Mr. Natividad would suffer serious prejudice were the stay denied, the SEC, which has already obtained injunctive relief, and conducted its factual analysis and arrived at its conclusion as to monetary relief, would not be adversely affected were the stay granted.

Rather than forcing Mr. Natividad to choose between protecting his rights against self-incrimination on one hand and a fair adjudication of monetary liability on the other, we ask the Court to apply the test set forth in *Walsh*, *supra,* at 527, and stay the SEC's motion for monetary relief against Mr. Natividad until the Canadian proceeding is concluded.

## FACTUAL AND PROCEDURAL BACKGROUND

The Complaint in this action alleges that Mr. Natividad and his co-defendant, while employed by a newswire service provider, engaged in insider trading based on material nonpublic information in press release headlines they accessed prior to public distribution of those releases.  (Dkt. 1, Compl. ¶¶ 1, 2)[1].  While the Complaint alleges that the Defendants had access to press release headlines, there is no allegation that they had access to the contents of the press releases themselves.

The contents of a press release may indeed contain detailed and specific information that constitutes material nonpublic information prior to public dissemination of the press release.  But by its very nature, a headline is far briefer and thus may, or may not, contain material information.  For example, while press releases disclosing companies' earnings frequently contain material information that is not public prior to release, a press release which simply

---

[1] References to "Dkt. __" refer to the cited document's docket number.

states that an issuer will report its earnings on a particular date, without disclosing anything about those earnings, may well not constitute material nonpublic information.

The SEC filed this action on September 30, 2022.  (Compl. Dkt. 1).  This action, however, is not the only proceeding concerning the Defendants' alleged insider trading.  On September 28, 2022, following an investigation by its Joint Serious Offenses Team, the Ontario Securities Commission commenced the OSC Case against Mr. Natividad and Mr. Saini, seeking criminal penalties, including imprisonment and fines, as well as disgorgement and trading prohibitions.  That prosecution is currently pending in the Superior Court of Justice in Ontario, Canada.  (*See* accompanying Declaration of Damien Frost in Support of Motion to Stay, Ex. A hereto.)

As the Court is aware, rather than contest the allegations in the Complaint, Mr. Natividad, without admitting or denying those allegations, consented to entry of a judgment, *inter alia,* enjoining him from violating Section 10(b) of the Securities exchange Act of 1934 [15 USC § 78j(b)] and Exchange Act Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].  The Court entered its Order and Final Judgment (the "Consent Order") on March 3, 2023.  (Dkt. 16).  Consistent with Mr. Natividad's consent, the Consent Order, in addition to enjoining him in the Final Judgment (Dkt. 16 at § I), also provided that the Court would determine what, if any, monetary award would be appropriate.  Specifically, Section II of the Consent Judgment provides that upon motion of the SEC:

> the Court shall determine whether it is appropriate to order disgorgement of ill-gotten gains and/or a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and, if so, the amount(s) of the disgorgement and/or civil penalty.  (Dkt. 16 at § II).

The SEC has made a motion asking the Court to impose an order of disgorgement against Mr. Natividad in the amount of $732,333, plus prejudgment interest thereon in the amount of

$54,772.66, for a total of $787,105.66 (Dkt. 17 and 17-5 at § II), and a civil penalty in the amount of $2,196,999 (Dkt. 17 and 17-5 at § III), for a combined total of $2,984,104.66.

The basis for the SEC's calculation of the amount of Mr. Natividad's alleged "ill-gotten gains" is set forth in the Declaration of Darren Boerner ("Boerner Decl.", Dkt. 17-3).  The basis for the prejudgment interest sought by the SEC is set forth in the Declaration of Stephen Kam ("Kam Decl.", Dkt. 17-2 at ¶ 5) and is a mathematical calculation predicated on the Boerner Declaration's calculation of gains.  Similarly, as set forth in the SEC's motion, the amount of the civil penalty it seeks is simply derived by multiplying the Boerner calculation of alleged "ill-gotten gains" by three.  (SEC Notice of Motion, Dkt. 17 at p.2).

As described in the Boerner Declaration, its calculation of alleged "ill-gotten gains" is based on an aware[ness] that Saini and Natividad were able to **review draft press releases in the in-progress queue prior to public dissemination of announcements**, and that they are alleged to have **traded on the information reflected in the draft press releases** in advance of the public dissemination of the announcements.  (Dkt. 17-3 at III Process for Calculations, ¶ 18, Emphasis added).

The Boerner Declaration analyzes when the defendants were allegedly able to "review press releases" and are alleged to have traded prior to publication of those press releases.  From that, the SEC's expert determined "Press Release Windows" and "In-The-Window Trading" (Dkt. 17-3 at ¶¶ 9 – 12), as well as the time and date when the releases became public and may have impacted stock prices, from which he determined the "Price Impact Date" (*id.* at 13).  Using those Price Impact Dates which, as described in the Boerner Declaration, followed publication of the **full text** of the press releases, the SEC's expert then calculated the defendants' alleged realized and unrealized gains and losses from "In-The-Window" trades (*id.* at ¶¶ 14 –

18).  The total of Mr. Natividad's alleged realized and unrealized "ill-gotten gains," that the SEC seeks to have the Court order him to disgorge, is the same amount, *i.e.,* $732,333, set forth in paragraph 18 of the Boerner Declaration.  (Dkt 17-3 at ¶ 18).

While the SEC seeks "disgorgement" of that amount, a comparison of the methodology of calculation detailed in the Boerner Declaration on one hand, and the SEC's Complaint on the other, appears to reflect a fundamental discrepancy between the factual predicate underlying that methodology through which that number was arrived at, and the allegations in the Complaint. That discrepancy relates to what the defendants were allegedly able to see and therefore rely on in making their allegedly unlawful trades.

While the SEC has calculated the impact on market price of public disclosure of the full contents of the press releases, the Complaint does not allege that the defendants had access to those contents.  Rather than alleging that the defendants had access to the contents of the press releases and material nonpublic information they may well have contained, the Complaint alleges only that the defendants had access to information "**about** each draft release, including the internal job identification number, the issuer's name, the press release headline, the time when the first draft of the release was submitted by the issuer, and, once set, the scheduled time for publication of the announcement to the public, and whether the release was publicly disseminated or published."  (Compl., Dkt. 1 at ¶ 16, emphasis added).

Based on the allegations in the Complaint, it appears that the only piece of information "about" the press releases that could have constituted or contained material nonpublic information was "the press release headline."  But the calculation in the Boerner Declaration looks only to the impact of publication of the complete content of the press releases – to which Mr. Natividad is not alleged to have had access – and makes no distinction with respect to

6

whether headlines did, or did not, contain or constitute material nonpublic information.  In so doing, the SEC's calculation methodology appears to fundamentally depart from the factual allegations in its Complaint.

That critical distinction – between press release headlines and press releases – was recognized by the OSC.  Unlike the calculations on which the SEC now relies for the amount of "ill-gotten gains" whose "disgorgement" it seeks, and its derivative calculation of prejudgment interest and civil penalty, the calculation of alleged insider trading profits undertaken by the OSC recognized and analyzed the distinction between press release headlines that may have contained material nonpublic information, and those that did not.  That is consistent with the fact that it is only information to which defendants allegedly had access that can constitute material nonpublic information on which they traded.

In the OSC Case, the OSC has produced a report by its forensic expert which analyzes each specific press release headline the defendants allegedly had access to and makes an assessment of whether the headline does or does not contain material nonpublic information. (Frost Decl., Ex. A at ¶ 8).  In undertaking that analysis, the OSC's forensic expert first distinguished between headlines that contained or constituted material nonpublic information ("MNPI").  Consistent with the charge that Mr. Natividad and his co-defendant had unlawfully engaged in insider trading on the basis of material nonpublic information, the OSC expert did not include headlines that did not include MNPI in calculating gains resulting from the use of such information, which by definition would not give rise to insider trading liability.  After eliminating headlines without MNPI, the OSC expert identified five types of headlines, including those related to earnings releases, clinical trial results, share capital, regulatory approvals and M&A/collaborations, and further categorized them.  After conducting that analysis, the OSC's

forensics expert concluded that headlines which either contained specific material nonpublic information or were directionally indicative of material nonpublic information contained in the body of the press release – which no one alleges the defendants could see – were headlines that constituted or contained material nonpublic information giving rise to insider trading liability. (Frost Decl. at ¶ 8).  Other than this fundamental analytic difference, and the SEC's inclusion of unrealized gains, the balance of the OSC forensic expert's methodology for calculating the defendants' alleged insider trading profits appears to be substantively the same as the SEC expert's methodology.

Even taking an arguably expansive view of which headlines contained or constituted material nonpublic information, the OSC forensic expert calculated that Mr. Natividad's gains from the same alleged insider trading activity at issue in this case as totaling $281,678.  (Frost Decl. at ¶ 9).  That is an amount more than 60% lower than the amount calculated by the SEC's expert who, without any apparent analysis, or basis in the Complaint, evidently treated all of the press release headlines to which Mr. Natividad allegedly had access as constituting or containing material nonpublic information.

Mr. Natividad's ability to provide factual input with respect to the analysis of his trading activity, and this critical distinction, is constrained by the currently pending OSC case in which he faces the prospect of up to 5 years less one day in prison.

## ARGUMENT

## I.

## THE DETERMINATION OF MONETARY RELIEF UNDER THE CONSENT JUDGMENT SHOULD BE STAYED PENDING RESOLUTION OF THE OSC CASE

The factual determination this Court must make in deciding the SEC's motion for monetary relief, is one as to which there is a genuine basis for dispute on which Mr. Natividad

can provide highly probative and relevant information.  To do so at this time however, Mr.

Natividad would be required to abandon his fundamental right against self-incrimination.  At a

time when Mr. Natividad is facing criminal prosecution in Canada, with the potential for five

years, less one day, of imprisonment, he should not be required to make a Hobson's Choice

between participating in the Court's search for truth on one hand, and his right to self-protection

on the other.

As the court in *Walsh* and many courts both before and since have concluded, a careful

consideration of a set of relevant factors, can properly eliminate that unfair dilemma through a

stay of civil proceedings while parallel criminal proceedings are pending.  A careful

consideration of the six factors enumerated in *Walsh* and recently reiterated in two cases in this

District, strongly supports granting Mr. Natividad's cross-motion for a stay.

**A.    The Consent Order Calls on the Court to Make a Factual
       Determination as to Which There is a Genuine Basis for Dispute**

The Consent Order calls on the Court to "determine whether it is appropriate to order

disgorgement of ill-gotten gains and/or a civil penalty… and, if so, the amount(s) of the

disgorgement and/or civil penalty." (Dkt. 16 at § II).  Thus, by its very terms, the Consent Order

requires the Court to make a factual determination concerning alleged insider trading gains.

Those alleged gains must be grounded in the allegations of the Complaint.

The disparity between the SEC and OSC expert analyses with respect to consideration of

whether headlines did, or did not contain or constitute material nonpublic information, and the

absence of allegations in the SEC Complaint that would justify treating all press release

headlines as containing or constituting material nonpublic information as the SEC's expert

evidently did, creates a significant question of fact that must be considered in deciding the

quantum of monetary relief to which the SEC is, or is not, entitled.

9

**B.    The Court Can Obtain Relevant Information from Mr. Natividad**
**Without Forcing Him to Abandon His Right against Self-Incrimination**

Mr. Natividad, as the participant in the trading activity on which this case and the OSC case against him are based, has highly pertinent information relevant to the determination of which trades were, or were not, based on material nonpublic information.  However, Mr. Natividad cannot provide that information now without abandoning the protections against self-incrimination guaranteed to him by the U.S. Constitution, the Canadian Charter of Rights and Freedoms and the International Covenant on Civil and Political Rights, to which the United States and Canada are both signatories.

In making the determination called for by the Consent Order, the Court can benefit from Mr. Natividad's information without forcing him to abandon his fundamental rights, by staying the determination of monetary relief until the conclusion of the OSC's criminal case, at which time he will no longer be placed in jeopardy by providing that information.

**C.    The Standard set forth in *Walsh***
**Strongly Supports Granting the Motion to Stay**

The Supreme Court long ago observed that the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.  *Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936).  And while staying a civil action is an extraordinary remedy, courts in this District, and the Supreme Court, have recognized that a stay of a civil case where there are pending criminal proceedings, while not constitutionally required, "may be warranted in certain circumstances."  *Walsh*, *supra*, 7 F. Supp. at 526 (citations omitted; *see also United States v. Kordel*, 397 U.S. 1, 12 n.27 (1970) (collecting cases) (noting "[f]ederal courts have deferred civil proceedings pending the completion of parallel criminal prosecutions when the interest of justice seemed to require such action").

10

In determining whether to grant a stay of a civil case when a parallel criminal case is pending, courts in this District routinely consider a six-factor test set forth in *Walsh,* 7 F. Supp. 2d at 527.

As recently reiterated by courts granting defendants' motions to stay civil proceedings in the face of parallel criminal cases in in *Licona v Tunnel Barrel & Drum Co., Inc*., 2023 WL 2644373 (D.N.J. 3/27/23) (Civil Action No. 22-cv-946-JMV-LDW) and *Carlton v. Atlantic County Justice Facility*, 2022 WL 16922151 (D.N.J. 11/14/22) (Civ. No. 21-5259 (NLH/SAK)), the factors the *Walsh* court identified are: (1) the extent to which the issues in the criminal and civil cases overlap; (2) the status of the case, including whether the defendants have been indicted; (3) the plaintiff's interest in proceeding expeditiously weighed against the prejudice to plaintiff cause by a delay; (4) the private interest of and burden on the defendants; (5) the interests of the court; and (6) the public interest.  *See Carlton, supra, at* \*2 (citing *Walsh*, 7 F. Supp. 2d at 527, citing *Trs. of Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134, 1139 (S.D.N.Y. 1995)).  *See also, Licona, supra*, at \*2.

Consideration of these factors strongly favors granting a stay in this case.

1.    There is virtually complete overlap between the civil and criminal cases:

As the courts in *Carlton* and *Licona* noted, "the similarity of the issues is recognized as 'the most important issue at the threshold' in determining whether or not to grant a stay.' "*Trs. of Plumbers & Pipefitters Nat'l Pension Fund, supra,* 886 F. Supp. at 1139. (quoting Milton Pollack, *Parallel Civil & Criminal Proceedings*, 129 F.R.D. 201, 203 (1990)). *See*, *Carlton, supra*, at \*2; *Licona, supra*, at \*2. In this case, the SEC civil action and the OSC criminal proceedings pertain to the same underlying allegations of insider trading based on material nonpublic information in press release headlines the Defendants allegedly accessed prior to

public distribution of those releases. Thus, this most important factor weighs fully in favor of a stay.

      2.    <u>There is an ongoing criminal case against Mr. Natividad</u>:

As the *Licona* court observed, "The phase of the parallel criminal proceeding may bear significantly on whether a stay of the civil case is appropriate." *Licona*, *supra*, at \*2, c*iting Walsh*, 7 F. Supp 2d at 527. As the *Licona* court continued, "[d]ue to self-incrimination concerns, the "strongest case for a stay of discovery in the civil case occurs during a criminal prosecution after an indictment is returned." *Id.* (quoting *Parallel Proceedings*, 129 F.R.D. at 203)." *Accord, Carlton, supra, at \*3*. This significant factor also supports granting the stay here. Under Canadian law, the criminal charges against Mr. Natividad, which, like all criminal cases in Canada was commenced by Information, have been brought and are being actively pursued by the OSC in the criminal case against him before the Superior Court in Ontario. (Frost Decl. at ¶ 1).

      3.    <u>The SEC will not be meaningfully prejudiced by a stay</u>:

In weighing the propriety of a stay under the *Walsh* test, a Court must consider possible prejudice to a plaintiff if the matter is stayed. As the *Carlton* and *Licona* courts both noted, in considering that question courts have recognized that "The mere fact that additional time will pass ... does not alone establish prejudice to the [p]laintiff; to show prejudice the plaintiff should demonstrate a unique injury, such as the dissipation of assets or an attempt to gain an unfair advantage from the stay." *Carlton*, *supra*, at \*3, *citing Tucker v. New York Police Dep't*, No. 08-2156, 2010 WL 703189, at \*7 (D.N.J. Feb. 23, 2010), *aff'd in part, dismissed in part*, 408 F. App'x 513 (3d Cir. 2010) (internal quotations and citation omitted). *See also, Licona*, *supra*, at

*3.  Here, we submit, the SEC cannot show a unique injury that would result, or unfair advantage that would be gained, if the case is stayed.

Through Mr. Natividad's consent, the SEC has already obtained injunctive relief against him.  Thus, any unlikely risk that a delay might leave the door open to future securities law violations has already been addressed.  In addition, as the SEC's motion reflects, it has already done its calculation of the monetary relief it seeks and there is no affirmative information it appears to require from Mr. Natividad for that calculus that might be lost to the mists of time were the stay to be granted.  Indeed, were Mr. Natividad's memory to fade, that would be to his detriment not the SEC's as he seeks to establish that alleged insider trades were in fact not.

Nor is this a situation in which the SEC's ability to enforce a monetary judgment would be impaired if this matter is stayed pending conclusion of the OSC criminal case.  As the SEC has been apprised, Mr. Natividad is insolvent.  (Auerbach Declaration in Support of Motion for Leave to Withdraw.)  Thus, even if Mr. Natividad were inclined to attempt to dissipate assets to frustrate enforcement of a monetary judgment (and there is no suggestion of any such inclination) his insolvency leaves him in no position to do so.  In short, the SEC would be in no better position to enforce a monetary judgment without a stay than it would be if the stay were granted, and therefore would not be prejudiced by the stay.

4.    Mr. Natividad will face a heavy burden if the stay is not granted:

As *Walsh* and the courts following it have recognized, there is a heavy burden on a defendant who must choose between either asserting his right against self-incrimination, with the permissible adverse inference which may flow from its invocation, or alternatively waiving that fundamental right and exposing himself to possibility of incrimination and incarceration.  While this Hobson's Choice may not be unconstitutional, courts have repeatedly exercised their power

to accommodate the parties' competing interests without requiring a defendant in parallel civil and criminal proceedings to choose between his economic and liberty interests.

In order to testify and contest the SEC's motion seeking almost $3 million in monetary relief, if a stay is not granted, Mr. Natividad would have to waive his rights under the U.S. Constitution, Section 7 of the Canadian Charter of Rights and Freedoms and Article 14(3) of the International Covenant on Civil and Political Rights, to which the United States and Canada are both signatories.  As *Walsh*, *supra*, at 528, *Licona*, *supra*, at *3, and *Carlton*, *supra*, at *3 all recognized, having to face waiving one of those protections is a heavy burden.  Here, having to waive all three protections to be able to defend against the SEC's motion is an uncalled-for burden.

    5.    The interests of the Court:

As the Opinion and Order in *Carlton* observed, and we fully appreciate, the Court has "an interest in judicial economy in terms of managing its caseload," *id.*, and ensuring the "just, speedy, and inexpensive determination of every action and proceeding."  Fed. R. Civ. P. 1; *see LM Ins. Corp. v. FAV Transp., L.L.C.*, No. 14-5424, 2015 WL 4915677 (D.N.J. Aug. 18, 2015), and "also has an interest in resolving individual cases efficiently" *citing Walsh Sec., Inc.*, 7 F. Supp. 2d at 528; *Carlton*, *supra*, at *4.  We also fully recognize and respect that no one knows better than this Court how to manage its caseload and each individual case before it.

We would simply and respectfully note that denying a stay, and forcing Mr. Natividad to respond to the SEC's motion by asserting his rights against self-incrimination, would deprive the Court of information pertinent to a full and fair discharge of the responsibility under the Consent Order to:

> determine whether it is appropriate to order disgorgement of ill-gotten gains and/or a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section

21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and, if so, the amount(s) of the disgorgement and/or civil penalty.  (Dkt. 16 at § 3).

6.     <u>The Public Interest will not be harmed by a stay</u>:

As *Walsh* and its progeny reflect, in weighing the public interest, courts appropriately consider whether the nature of the case is such that a stay will harm that interest.  In this case, we submit that there is no harm.

The first line of public defense that SEC civil actions seek to establish is against future violation of the securities laws.  The SEC seeks that protection for the public through injunctions against such violations.  Here, the SEC has already achieved that first order line of defense through the Consent Order, whose entry Mr. Natividad fully agreed to.

With respect to the second public benefit the SEC seeks in cases such as this, disgorgement and/or civil monetary penalties, a stay here will not undermine that benefit.  As courts have observed when there are parallel civil and criminal cases, staying the former to allow the latter to proceed unimpeded, frequently simplifies the issues that remain to be determined in the civil case.  *See, e.g.*, *Licona*, *supra*, at *4; *Carlton*, *supra*, at *4.  That would be a benefit to both the public and the Court.  Here, the SEC's ability to obtain a full and fair determination of the monetary relief it seeks on the public's behalf, will likely be enhanced rather than diminished when the OSC Case proceeds to conclusion.

Moreover, in light of Mr. Natividad's insolvency and the consequent absence of any prospect that assets to satisfy a judgment would be diminished, the delay attendant upon a stay would not reduce the public benefit of a judgment for monetary relief that would be essentially pyrrhic, at last at present.  Thus, we submit that there is no harm to the public that outweighs Mr. Natividad's interests that would be protected by a stay.

## <u>CONCLUSION</u>

For the reasons set forth above, Mr. Natividad's cross-motion for a stay should be granted.

Dated:  June 20, 2023                          Respectfully,

By:  _/s/_ Joseph Gallo
       Joseph Gallo
       Martin J. Auerbach
       **WITHERS BERGMAN LLP**
       430 Park Avenue, 10th Floor
       New York, New York 10022
       Phone: (212) 848-9856
       Fax: (212) 848-9888
       Joseph.Gallo@withersworldwide.com
       Martin.Auerbach@withersworldwide.com

       *Attorneys for Defendant*
       *John Lester Mandac Natividad*

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

    v.

HARPREET SAINI and JOHN LESTER
MANDAC NATIVIDAD,

                Defendants.

Civil Action No.: 2:22-cv-05788-KM-AME

*Document Filed Electronically*

### DECLARATION OF DAMIEN FROST IN SUPPORT OF
### DEFENDANT JOHN LESTER MANDAC NATIVIDAD'S
### CROSS-MOTION FOR A STAY

I, **DAMIEN FROST**, am a solicitor and barrister duly licensed to practice in the province of Ontario, with the right to make appearances before courts in every other province and territory of Canada, and declare under penalty of perjury, as follows:

1.   I am the Principal of Damien Frost & Associates LLP and have been licensed to practice law since 1981. I have been retained to represent John Lester Mandac Natividad ("Mr. Natividad") in the matter of *Ontario Securities Commission vs. John Lester Natividad and Harpreet Saini* (the "OSC Case"). The case against Mr. Natividad and his co-defendant was commenced by Information, which is how all criminal cases in Canada commence. The Information charging Mr. Natividad, number 3111-999-22-31100253-(01)(02), was sworn on September 28, 2022. Mr. Natividad is facing two charges before the Ontario Court of Justice in Brampton, Ontario. Mr. Natividad was charged with fraud under section 126.1(1)(b) of the *Securities Act*, and Insider Trading under section 76 of the *Securities Act*. By virtue of my representation of Mr. Natividad, I am familiar with the facts stated herein.

1

2.   I respectfully submit this Declaration to the Court in support of Mr. Natividad's Cross-Motion for a Stay of the motion by the United States Securities and Exchange Commission ("SEC') seeking a judgment of monetary relief against Mr. Natividad.

3.   The charges in the OSC Case are the result of an investigation by the Joint Serious Offenses Team of the Ontario Securities Commission ("OSC") into trading by Mr. Natividad and his co-defendant while they were employed in the Toronto office of Intrado Corporation, a global communication services provider that owns GlobeNewswire, a newswire distribution network specializing in the distribution of corporate press releases to the public.

4.   According to the charges lodged in the OSC Case against Mr. Natividad and his co-defendant, by virtue of their employment they had access to press release headlines prior to their public release.  The Information against Mr. Natividad and his co-defendant alleges that they were able to view particulars about the press releases including the job ID, the press release headline and the issuer's desired publication date and time, prior to public dissemination of the press release.

5.   I am familiar with the allegations set forth in the SEC's Complaint in this matter.  While the statutory violations Mr. Natividad is alleged to have committed in the OSC Case and this case naturally differ because one is brought under Canadian law and the other under United States law, the gravamen of the offenses is the same and the factual allegations underlying the charges and claims in the two cases are virtually identical.

6.   In the course of discovery in the OSC Case, the Crown has disclosed and indicated that they anticipate introducing in support of the charges at trial evidence contained in the Expert Report of Matthew D. Cain, Ph.D. dated January 17, 2023 (the "OSC Expert's Report").

7.   In the OSC Expert's Report calculating the amount of Mr. Natividad's profits allegedly realized from unlawful insider trading based on material nonpublic information, Dr. Cain reviewed and analyzed a range of information, comparable to that analyzed by the SEC's expert in this case

such as trading and account information, the timing of trading, and information concerning changes in stock price following the public dissemination of the press releases at issue.  While the SEC's expert calculated realized and unrealized gains, Dr. Cain focused on realized gains.

8.  In addition to their largely comparable review, Dr. Cain also reviewed and analyzed the press release headlines underlying the charges against Mr. Natividad, to determine whether they did, or did not, contain or constitute material nonpublic information.  Consistent with the premise that the alleged unlawful activity was insider trading based on material nonpublic information ("MNPI") in press release headlines, Dr. Cain did not include press release headlines which did not contain MNPI in his calculation of allegedly unlawful profits and thus by definition would not give rise to insider trading liability.  In addition to excluding headlines from his calculation that did not include MNPI, Dr. Cain further analyzed non-neutral headlines and categorized them into five different groups: (i) earnings releases; (ii) clinical trial results; (iii) share capital announcements; (iv) regulatory approvals; and (v) M&A / Collaborations.  Within each of these groups or types of press release whose headlines Mr. Natividad and his co-defendant were able to access, Dr. Cain further categorized these non-neutral releases – for example, positive or negative earnings releases or trial results, share repurchases, FDA and other regulatory approvals or dissatisfaction, and acquisitions of mergers – to determine the extent of correlation between trading by the Defendants and the direction indicated by the headlines.

9.  Based on his analysis, the OSC's expert calculated that Mr. Natividad realized $282,678 in aggregate profits from allegedly unlawful insider trading based on material nonpublic information.

I declare under penalty of perjury that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

Dated: June 20, 2023

Damien Frost
LSO # 20598Q

3